NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ROSETTA LEE RAPP,

                    Plaintiff,

v.                                                  Case No.   6:12-cv-1855-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____

# ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Plaintiff Rosetta Lee Rapp seeking review of the final decision of the Commissioner of Social

Security denying her claim for social security benefits, Doc. No. 1, the answer and certified copy

of the record before the Social Security Administration ("SSA"), Doc. Nos. 8, 9, and the parties'

memoranda, Doc. Nos. 18, 19.   The case is before the undersigned for disposition on consent of

the parties.   Doc. Nos. 11, 12.

## PROCEDURAL HISTORY.

In 2010, Rapp filed applications for benefits under the Federal Old Age, Survivors and

Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental

Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*

(sometimes referred to herein as the "Act").   She alleged that she became disabled on February 1,

2008.   R. 158, 160.

1

NOT FOR PUBLICATION

After the applications were denied originally and on reconsideration, Rapp asked for a hearing before an Administrative Law Judge ("ALJ").   R. 100.   An ALJ held a hearing on September 27, 2011.   Rapp, accompanied by an attorney, and a vocational expert ("VE") testified.   R. 35-77.

After considering the hearing testimony and the evidence in the record, the ALJ found that Rapp was insured under OASDI through March 31, 2009.   The ALJ concluded that Rapp had not engaged in substantial gainful activity since the alleged disability onset date.   R. 23.

The ALJ found that Rapp had obesity, status post carpal tunnel surgeries, hypothyroidism, hypertension, hip pain and depression, which were severe impairments.   *Id.*   These impairments did not meet or equal a listed impairment.   R. 24-25.   In reaching these conclusions, the ALJ found that Rapp would have mild limitations in activities of daily living, social functioning and concentration, persistence or pace, with no episodes of decompensation.   R. 24.

The ALJ concluded that Rapp had the residual functional capacity ("RFC") to perform sedentary work, except that Rapp could never climb ladders/ropes/scaffolds.   She could occasionally climb stairs, kneel, balance, and stoop.   She could never crouch and crawl.   She must avoid concentrated exposure to hazards including dangerous machinery and unprotected heights.   She would be limited to work involving simple 1-2 step tasks.   R. 25.

The ALJ found that Rapp could not return to her past relevant work.   R. 26-27.   After considering the testimony of the VE, the ALJ found that there were jobs available in the national economy that Rapp could perform, specifically addresser and escort vehicle driver.   R. 27. Accordingly, the ALJ found that Rapp was not disabled.   R. 28.

Rapp sought review of the ALJ's decision by the Appeals Council.   R. 14.   On October 15, 2012, the Appeals Council found no reason to review the ALJ's decision.   R. 1-3.

Rapp now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).   A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the parties' memoranda and the ALJ's decision.   Accordingly, I will only summarize the facts of record relevant to the issues presented in order to protect Rapp's privacy to the extent possible.

Rapp was born in 1967.   She completed school through the sixth grade.   R. 41.   She had problems with reading and writing.   R. 48.   She could make change if it was shown on a register, but not otherwise.   R. 48-49.

Rapp had previously worked as a waitress, as a cashier and briefly as a maid.   R. 44, 46, 70-71.   She stopped working as a waitress because she could not lift due to pain from her shoulders to her elbow, neck pain, and her hands became numb.   R. 45-46.   After that, she tried to work as a cashier, but could not do so because she could not accurately account for the money

in the register and make change. R. 46-47.   She could not work as a maid because she could not use her hands to clean and she could not get down on her knees.   R. 48.

Medical records show that Rapp was injured on June 4, 2000.   R. 298.   On January 30, 2002, she sought treatment from George White, M.D., a hand surgeon.   She complained of intermittent numbness and tingling in her fingers, aching pain from her elbow to her shoulders, numbness in her arms and loss of grip and pinch strength in both hands.   A previous physician had diagnosed bilateral carpal tunnel syndrome after nerve testing.   Rapp had bilateral carpal tunnel release surgery in 2001.   After the surgery, her condition did not improve.   *Id.*

Upon examination, Dr. White observed a Tinel's sign at both elbows and a positive Finkelstein's sign bilaterally.[1]   She had limited mobility of her fingers due to pain.   She had loss of grip and pinch strength bilaterally.   Dr. White opined that Rapp had resolved carpal tunnel. He indicated that Rapp had mild ulnar neuritis of both elbows, bilateral flexus synovitis in fingers one through five, and bilateral de Quervain's tenosynovitis.[2]   R. 299.   He recommended steroid injections, a long arm splint and a Medrol Dose-Pak followed by ibuprofen.   He placed Rapp on light duty with no lifting over 5 pounds and no repetitive lifting, pushing, pulling, grasping or pinching.   She had not yet reached maximum medical improvement ("MMI").   R. 300.

---

[1] A Tinel's sign and a Phalen's sign are tests to evaluate carpal tunnel syndrome.   *Carpal Tunnel Syndrome Health Center*, WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited March 20, 2014).   A Finkelstein's sign is a test used to evaluate de Quervain's tenosynovitis.   *Diseases and Conditions*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/multimedia/finkelstein-test/img-20005987 (last visited March 20, 2014).

[2] De Quervain's tenosynovitis is a painful condition affecting the tendons on the thumb side of the wrist, which makes it painful every time a person turns her wrist, grasps anything or makes a fist.   *De Quervain's tenosynovitis*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238 (last visited March 20, 2014).

Rapp returned to Dr. White on February 7, 2002.   Her condition had improved although she still had persistent ulnar nerve symptoms with numbness and tingling and loss of grip and pinch strength in both hands.   She had positive Tinel's and Phalen's signs bilaterally.   She remained on the same restrictions and had not reached MMI.   R. 301.   As of February 28, 2002, Dr. White noted marked improvement.   He increased her lifting to 10 pounds with no repetitive lifting, pushing or pulling.   R. 302.

On April 18, 2002, Rapp still complained of persistent pain apparently in her left wrist. Dr. White noted that Rapp had not been as compliant as she could be with avoiding pressure to her elbow and wearing her splint at night.   She still had a positive Finkelstein's test with pain on forced flexion, forced extension and classic de Quervain's tenosynovitis.   He indicated that he had exhausted conservative management and opined that Rapp's condition would be "persistently painful without surgical intervention."   He recommended a de Quervain's release surgery.   Her restrictions remained the same.   R. 304.

Rapp stopped seeing Dr. White after her workers' compensation claim was settled because she did not have health insurance.   R. 50.   She testified that her condition worsened after she stopped treatment with Dr. White.   R. 51.

In March 2010, William Newsome, M.D., examined Rapp at the request of the SSA. Rapp complained of bilateral wrist and elbow pain with numbness and tingling.   R. 345.   Upon examination, Dr. Newsome observed decreased range of motion in both wrists.   R. 346.   He did not observe swelling or tenderness in the elbows or wrists, but she had reduced range of motion in the forearm and wrist and her motor strength was 4/5 bilaterally.   She had a positive Tinel's sign in her hands, but her grip strength was 5/5 bilaterally and fine manipulation of her hands was

5

NOT FOR PUBLICATION

normal.   R. 347.   Dr. Newsome did not note problems with Rapp's hips or knees, but she walked

with a mildly antalgic gait.   Her affect and tone were normal.   His diagnoses included bilateral

carpal tunnel syndrome status post surgery and bilateral elbow pain.   He opined that Rapp's

subjective complaints were consistent with objective medical findings with the exception of the

elbow pain.   He indicated that there were no medical records to support that claim.   R. 347.

In June 2010, Thomas Peele, M.D., prepared a physical RFC assessment after reviewing

Rapp's records, including records of treatment by Dr. White.   S*ee* R. 374-81.   Dr. Peele opined

that Rapp could lift up to 20 pounds occasionally and 10 pounds frequently.   She could sit, stand

or walk about 6 hours in an 8-hour workday.   She was not limited in the ability to push or pull.

She could only occasionally climb ladders/ropes/scaffolds.   R. 375-76.

Medical records also show that Rapp complained of mood swings with insomnia and

anger in 2007.   R. 322.   In September 2009, she reported feeling anxious and stressful.   R. 331,

387.   On June 28, 2010, Maxine Ruddock, Ph.D., prepared a Psychiatric Review Technique form

after review of Rapp's records.   She found that Rapp suffered from depression and anxiety.   Dr.

Ruddock concluded that Rapp's mental condition would result in only mild limitations in

activities of daily living, social functioning and concentration, persistence or pace with no

episodes of decompensation.   Accordingly, Dr. Ruddock opined that Rapp did not have a severe

mental impairment.   R. 360-72.

Rapp was treated at the Osceola County Health Department from September 2009 through

August 2011.   The handwritten progress notes are largely illegible.   In March 2009, Rapp

complained of a tingling and crawling feeling in her shoulder.   R. 332.   In September 2009, she

6

complained of a needle in her right foot.   R. 387.   It appears that she complained of hip pain in

2011.   R. 391, 397.

At the ALJ's hearing, Rapp testified that he had not had additional treatment because she

did not have insurance.   *See, e.g.*, R. 50, 53.   She did not have the money to get X-rays for her

hips and knees.   R. 52.   Her husband paid for her medication, which was not very expensive,

with cash.   R. 63.

Rapp testified that she was able to cook with the help of her daughter, who performed any

heavy lifting.   R. 57.   She could put clothes in a washer but she could not pull the wet clothes

out with her hands.   R. 58-59.   She held on to a cart when grocery shopping.   R. 60.   Rapp had

a driver's license and was able to drive, but she had difficulty steering due to problems with her

hands.   R. 42-43.   She had to stand after sitting for a time due to pain in her hips.   R. 59.   She

could not get down on her hands and knees due to pain in her hips.   R. 60.   Motrin helped lessen

the pain.   R. 67.   She had headaches when her blood pressure was high.   She tried to stay to

herself.   *Id.*

The ALJ asked the VE to assume a person of Rapp's age, education and work experience

who is able to do the following:

> [S]he could do sedentary work . . . . But would never be able to climb
> ladders, ropes, or scaffolds.   Can occasionally climb stairs, kneel,
> balance, stoop.   Never crouch, crawl.   Must avoid concentrated
> exposure to hazards, including . . . dangerous machineries and
> unprotected heights.   And would be limited . . . to simple one, two-
> step tasks.

R. 71-72.   The VE testified that this hypothetical person could not perform Rapp's past relevant

work.   The person could perform the sedentary, unskilled jobs of addresser and escort car driver,

which are available in the national economy.   R. 72, 74.

The ALJ then added additional limitations of only occasional operation of a motor vehicle, occasionally engaging in repetitive use of the upper extremities for fine and gross manipulation of objects, a sit-stand option and limitation to superficial contact with the public.   The VE testified that, with these additional limitations, there would be no job the individual could perform.   R. 75.

## ANALYSIS.

Rapp contends that the ALJ erred by failing to include manipulative limitations in the RFC, which resulted in her failure to accept the testimony of the VE.   She asserts that the ALJ did not properly assess her complaints of pain and other subjective symptoms.   She contends that the ALJ erred by failing to discuss the treatment by Dr. White and by failing to recontact him or order a consultative examination.   She contends that the ALJ also should have ordered a consultative examination to address her mental impairment.   She submits that the ALJ erred by relying on her failure to obtain additional treatment in light of the evidence that she did not have the financial ability to do so.   I will address only some of these issues, because I find them to be dispositive.[3]

---

[3] The parties were informed in the Scheduling Order that issues not specifically raised would be considered to have been waived.   Doc. No. 10 at 2.

NOT FOR PUBLICATION

*Manipulative Limitations and the Opinions of Dr. White.*

In the decision, the ALJ reviewed the medical evidence of record after the disability onset date, and referred specifically to the consultative examination by Dr. Newsome and generally to the "State agency consultants" who prepared physical RFC assessments after review of Rapp's records.   R. 26.[4]   The ALJ did not, however, state the weight she gave to any of these opinions and she did not explain with any specificity why she rejected Rapp's complaints of pain and difficulty using her hands and arms except for a general finding that that "[t]here is little corroborating medical evidence . . . ."   *Id.*

In this context, the opinions of Dr. White rendered before the disability onset date become important.   Even though Dr. Newsome observed on examination that Rapp had reduced range of motion in both forearms and wrists with decreased motor strength and a positive Tinel's sign, he rejected Rapp's complaints of bilateral elbow pain because there were no medical records supporting this claim.   R. 347.   Contrary to Dr. Newsome's finding, there were ample findings in Dr. White's records that Rapp had de Quervain's tenosynovitis that would be "persistently painful without surgical intervention."   R. 304.   Under these circumstances, the ALJ's failure to discuss the opinions of Dr. White, a treating physician, and provide good cause for not crediting his opinions constitutes reversible error.   *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).

---

[4]   The ALJ cited exhibits 6F and 9F as the opinions of the State agency consultants.   Exhibit 9F is the opinion of Dr. Peele, discussed above.   Exhibit 6F is a physical RFC assessment by a single decisionmaker.   Opinions by single decisionmakers are not opinion evidence at the appeal levels.   It is doubtful that the opinion of a single decisionmaker is evidence that may properly be considered by an ALJ. *See Miller v. Astrue*, No. 1:10cv1028-WC, 2012 WL 174589, at * 3 (M.D. Ala. Jan. 23, 2012) (reversing the final decision of the Commissioner because the ALJ's reliance on the opinion of a single decisionmaker was error).

For these reasons, the final decision of the Commissioner will be reversed and the case will be remanded for further proceedings.

*Remand for Benefits or Further Proceedings.*

Rapp asks that the Court remand the case for an award of benefits.   The Court may only do so "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt."  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).   Because the Commissioner has not yet properly evaluated whether Rapp has functional limitations arising from impairments in her arms, wrists and hands, the record is not sufficient to determine that Rapp is disabled beyond doubt.   Therefore, remand for further proceedings is warranted.

On remand, the Commissioner should require the ALJ to reassess the other issues raised in the memorandum filed by Rapp's counsel.   Among other things, the ALJ should not rely on lack of treatment as a basis for finding that Rapp's complaints are not credible when, as here, there is ample evidence that Rapp could not afford treatment.   *See* Soc. Sec. Ruling 96-7p, 1996 WL 374186, at * 8 (July 2, 1996).   Rapp's sole treatment from 2009 through 2011 at a public health agency corroborates her testimony that she could not afford treatment by specialists.

**CONCLUSION.**

For the reasons stated above, it is **ORDERED** that the final decision of the Commissioner is **REVERSED** pursuant to sentence four of § 405(g) and the case is **REMANDED** for further

NOT FOR PUBLICATION

proceedings.   The Clerk of Court is directed to issue a judgment consistent with this Order and,

thereafter, close the file.

**DONE AND ORDERED** this 21st day of March, 2014.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE